[Crim. No. 930. First Appellate District, Division Two.—April 30, 1921.]

# THE PEOPLE, Respondent, v. ALICE WOODCOCK, Appellant.

[1] CRIMINAL LAW — PERJURY — EVIDENCE — CORROBORATING CIRCUM- STANCES.—Where, in a prosecution for perjury, the state relies upon the direct testimony of one witness and corroborating cir- cumstances, the character of corroboration necessary is like that in the case of an accomplice arising under section 1111 of the Penal Code, and such circumstances must be more than evidence tending to prove that the testimony was given and that it may or may not be false.

[2] ID.—TESTIMONY OF ACCOMPLICE—CORROBORATING CIRCUMSTANCES. It is necessary that the evidence corroborating an accomplice shall connect or tend to connect the defendant with the commission of the crime, and it is insufficient where it merely casts a grave suspicion upon the accused.

[3] ID.—ALLEGED FALSE TESTIMONY IN MURDER TRIAL—INSUFFICIENCY OF EVIDENCE TO SUSTAIN VERDICT.—In this prosecution for per- jury alleged to have been committed by a wife in the course of her testimony in the trial of her husband upon a charge of mur- der, the evidence is held insufficient to sustain the verdict on any of the several counts of the indictment.

[4] ID.—ASSUMPTION OF PROVED FACTS—ERRONEOUS INSTRUCTIONS.— In such a prosecution, language in the instructions carrying the inference that the facts supporting the prosecution's theory ex- isted was erroneous, in view of section 19 of article VI of the constitution, which provides that judges shall not charge juries with respect to matters of fact.

[5] ID.—QUANTUM OF PROOF—ERRONEOUS INSTRUCTION.—In such a prosecution, a proposed instruction that no amount of corrobora- tion will be sufficient to justify the conviction of one accused of perjury, where the testimony of the witness to be corroborated is uncertain in negativing the alleged perjurious testimony of 'the accused, was erroneous and was properly refused. (Opinion of supreme court on denial of hearing.)

[6] ID.—DISREGARD OF SYMPATHY—PROPER INSTRUCTION.—In such a prosecution, an instruction that although the jury might sympa- thize with those who suffer, they were bound by their oaths to ad- minister judgment according to the law and the evidence and should not act upon their sympathies, and that mercy did not be- long to them, was not erroneous. (Opinion of supreme court on denial of hearing.)

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. Louis H. Ward, Judge. Reversed.

The facts are stated in the opinion of the court.

Connick & Kehoe and James F. Brennan for Appellant.

U. S. Webb, Attorney-General, and John H. Riordan, Deputy Attorney-General, for Respondent.

NOURSE, J.—Defendant appeals from a judgment of conviction upon nine separate counts charging her with perjury alleged to have been committed by her in the course of her testimony in the trial of her husband upon a charge of murder. The facts of the case are: On the eighteenth day of September, 1919, the defendant and her husband, Edgar Woodcock, and a friend named Cooper, were walking along Market Street, in the city and county of San Francisco, in a westerly direction, the defendant walking about twenty feet in advance of her companions. After they had crossed Van Ness Avenue, still going west, the defendant was approached by one Kelly, who, she testified, rattled some money in his pocket and endeavored to make her acquaintance, whereupon she turned to her companions, who rushed up to her, and in the altercation which ensued Edgar Woodcock shot and killed Kelly. Edgar Woodcock was thereupon arrested and charged with murder. Defendant immediately went to her home, which was across the street from the place where the shooting occurred. Shortly thereafter three police officers called at her apartment and obtained an oral statement from her. She was thereupon taken to the Hall of Justice and in the presence of one of these officers signed a written statement which was prepared by him. From these statements the prosecution, in the case of her husband charged with the murder of Kelly, developed the theory that in accordance with a prearranged plan between the defendant, her husband, and Cooper, the three set out on the streets of San Francisco with the understanding that the defendant should precede her two companions and that, if she were approached by any strange man, she was to signal to her companions and they would

thereupon come to her assistance and chastise the offending party.

In the course of her examination in the murder case the defendant testified that on the Tuesday preceding the Thursday when the shooting occurred she had told her husband that she had been annoyed by different men as she went to the public library for books in the evening; that her husband scoffed at the idea and said that if she would go out with him that evening he would satisfy her that such things would not occur; that on the evening of September 18th her husband came home and told her that it would be necessary for him to work that night at the State Mining Bureau in the Ferry building, in the city and county of San Francisco, where he was employed, and that Cooper was going there with him to help him pack an exhibit; that at about 8 o'clock that evening Cooper called at their home at the Crockett apartments on the south side of Market Street, and after some conversation about books and authors defendant's husband asked her to get a certain book from the public library at Larkin and McAllister Streets; that she objected to going out that evening because, as she said, she was not feeling well, and that her husband urged her to go to the library, saying that he and Cooper would walk over as far as the library with her on the way to the Mining Bureau; that the three left the apartment, walked across Market Street to the north side and thence easterly along Market Street to Larkin, and thence up Larkin Street to the public library; that during their walk that evening she went on ahead of her husband and Cooper, who walked together a short distance behind her; that as she passed along Larkin Street toward the library a strange man drove an automobile to the curb and invited her to ride with him; that when she got to the intersection of Fulton and Larkin Streets he turned his automobile into Fulton Street close to the sidewalk and again asked her to take a ride; that thereupon she turned around to her husband and on his approaching her she told him that the stranger had spoken to her; that the husband thereupon went to the automobile and slapped the stranger, while she continued on to the library and obtained the book; that on coming out she was surprised to find her husband and Cooper waiting for her, and after some

conversation they started home, she preceding her two companions as before and continuing out Market Street to the juncture of Market, Haight, and Gough Streets, a point about opposite the place where she lived; that she there gave the book which she had procured at the library to her husband and purchased a magazine at the news-stand, and after some conversation relative to the absence of a policeman upon the beat the three determined to walk down Market Street again as far as Larkin to see if by any chance any policeman might be upon that beat. This same question had been discussed between the defendant and her husband in their conversation on the Tuesday preceding the day of the shooting, at which time, as the defendant testified, she had told her husband that in all her walks to the library she had never seen a policeman on that beat. The defendant further testified that the three walked down Market Street in an easterly direction to Larkin Street, where she stopped to look in the window of a store, and when she saw the reflection of her companions she turned and walked back on Market Street toward her home; that in the middle of the block between Van Ness Avenue and Franklin Street the deceased, who was a stranger to her, approached the second time that evening and spoke to her, and that she turned and called to her husband, whereupon he and Cooper ran up to Kelly and in the encounter between her husband and Kelly the shooting occurred.

The trial of Edgar Woodcock on the charge of murder resulted in a verdict of "not guilty" on December 19, 1919. On the 31st of October, 1919, the defendant, Alice Woodcock, was also accused of the crime of murder growing out of the same state of facts, but was not brought to trial upon that charge. The trial of Edgar Woodcock was followed by indictments charging both Edgar Woodcock and the defendant with perjury committed in the course of the murder trial. Cooper, the other party to the occurrence of September 18th, having left the state immediately after the shooting, was indicted for murder and returned to the state for the purpose of testifying in an investigation concerning the alleged perjury of the two Woodcocks. He was the principal witness before the grand jury on this investigation and, with a few exceptions which will be hereafter noted, was the only witness at the trial of the defendant on whose

testimony the prosecution depended to prove the perjury of the defendant.

As in the murder case, the prosecution in the perjury case proceeded upon the theory that the two Woodcocks and Cooper had entered into a conspiracy whereby they should walk upon the streets of San Francisco, the defendant to precede her two companions so that if she were accosted by any stranger they would take the law in their own hands and chastise the offending party. In support of this theory of conspiracy it was alleged in the indictment that during the course of the trial of Edgar Woodcock for murder it became material to know whether on the evening of the 18th of September, 1919, or prior thereto, there was an arrangement, agreement, or understanding between the defendant and her husband or between the defendant, her husband, and Cooper, or between defendant's husband and Cooper, to the effect that the three should go upon the streets of San Francisco walking in the manner in which they walked that evening in order that the defendant's companions might chastise any stranger who should accost or offend her. The indictment is divided into eleven counts, each of which it is claimed relates to one charge of perjury. The defendant went to trial before a jury and was acquitted on the fourth and ninth counts and found guilty on the remaining nine counts of the indictment. The motion for a new trial having been denied, she prosecutes this appeal from the judgment following the verdict.

Before discussing the various counts of the indictment, it is well to advert to the general rules of law relating to perjury and the testimony necessary to convict one of that offense. Section 118 of the Penal Code provides: "Every person who, having taken an oath that he will testify . . . truly . . . willfully and contrary to such oath, states as true any *material* matter which he knows to be false, is guilty of perjury." Section 1103a of the same code provides that "perjury must be proved by the testimony of two witnesses, or of one witness and corroborating circumstances." Section 1844 of the Code of Civil Procedure provides that "the *direct* evidence of one witness who is entitled to full credit is sufficient for proof of any fact, except perjury and treason." Section 123 of the Penal Code provides that "it is no defense to a prosecution for perjury

that the accused did not know the materiality of the false statement made by him; or that it did not, in fact, affect the proceeding in or for which it was made. It is sufficient that it was material, and might have been used to affect such proceeding."

[1] Where, as in this case, the prosecution relies upon the direct testimony of one witness and corroborating circumstances to prove the perjury, the character of corroboration necessary is like that in the case of an accomplice arising under section 1111 of the Penal Code. In other words, the corroborating circumstances used to support the testimony of a single witness must be more than evidence tending to prove that the testimony was given and that it may or may not be false. [2] The rule as to the character of corroborating circumstances necessary to support the testimony of an accomplice is well stated in 12 Cyc., at page 456, quoted with approval by the supreme court in *People* v. *Robbins,* 171 Cal. 466, 470, [154 Pac. 317, 319], as follows: " 'It is necessary that the evidence corroborating an accomplice shall connect or tend to connect the defendant with the commission of the crime. Corroborative evidence is insufficient where it merely casts a grave suspicion upon the accused. It must not only show the commission of the offense and the circumstances thereof, but must also implicate the accused in it. . . . But where the circumstances when proved, taken separately or collectively, are consistent with the innocence of the accused, there is no corroboration, and a verdict of conviction thereon will be set aside.' " And in the same case the court said (171 Cal. 471, [154 Pac. 319]): "The corroborative evidence required to convict the defendant in addition to that of the accomplice is not sufficient if it merely tends to raise a suspicion of the guilt of the accused. . . . *Mere suspicion, as has been shown, will not suffice as corroborative evidence;* and where the evidence relied upon as corroborative of the accomplice is, as in the present case, only such as to raise a suspicion of the guilt of the defendant, the verdict must be set aside." Then again (171 Cal. 476, [154 Pac. 321]): "The proofs of mere suspicious circumstances and of opportunity to commit a crime are never sufficient to justify a conviction upon the testimony of an accomplice. (*People* v. *Thompson,* 50 Cal. 480; *People* v. *Smith,* 98 Cal. 218,

[33 Pac. 58]; *People* v. *Koening,* 99 Cal. 574, 576, [34 Pac. 238]; *State* v. *Willis,* 9 Iowa, 582; ·*People* v. *Morton,* 139 Cal. 725, [73 Pac. 609].)'' (Emphasis added here.)

In *People* v. *Morton,* 139 Cal. 719, at page 724, [73 Pac. 609, 611], the supreme court quoted with approval from *Welden* v. *State,* 10 Tex. App. 400, as follows: '' 'We suggest this mode as a proper test: eliminate from the case the evidence of the accomplice, and then examine the evidence of the other witness or witnesses with the view to ascertain if there be inculpatory evidence—evidence tending to connect the defendant with the offense. If there is, the accomplice is corroborated; *if there is no inculpatory evidence, there is no corroboration, though the accomplice may be corroborated in regard to any number of facts sworn to by him.*' '' And again, on the same page, the court said: ''In New York, under the same code provision (Code Crim. Proc., sec. 399), it was said: 'The corroboration, however strong in all other respects, must point to the connection of the defendant with the commission of the crime to be of any avail.' (*People* v. *Ryland,* 28 Hun (N. Y.), 568, 570.)'' (Emphasis added here.)

There is no essential difference between the provisions of section 1103a of the Penal Code and section 1111 in so far as the law requires that the corroborating evidence ''shall tend to connect the defendant with the commission of the offense.'' Where, as in the present case, the corroborating circumstances are made to take the place of the direct testimony of a second witness, evidence of such corroborating circumstances must, like the testimony of such witness, tend to connect the defendant with the commission of the offense; otherwise the perjury is not proved. Hence, the rule of *People* v. *Compton,* 123 Cal. 403, 411, [56 Pac. 44, 47], approved in *People* v. *Morton,* 139 Cal. 719, 725, [73 Pac. 609], is applicable to a case of this kind. In that case the court had instructed the jury that ''it is sufficient if such corroborative evidence tends in any way to connect the defendant with the commission of the crime charged.'' In rejecting the instruction the supreme court said: ''This instruction fails to take account of the essential character necessary to the corroborative evidence, which is that, standing alone, or, as it is phrased in the code, 'without the aid of the testimony of the accomplice,' it must tend to

connect the defendant with the commission of the crime. Here the jury was told that it is sufficient if such corroborative evidence tends *in any way* to connect the defendant with the commission of the crime. Such is not the law. It could tend to connect him with the crime by considering it with the testimony of the accomplice; yet, if it is necessary so to consider, it would not be legally sufficient. It is legally sufficient only if, standing alone, it tends so to connect him.''

### First Count.

[3] Two objections are made to the judgment of guilty upon this count,—first, that the indictment fails to state a public offense, and, second, that the evidence is insufficient to sustain the verdict. Both objections are good. (1) It is alleged in the indictment that during the course of the trial of Edgar Woodcock for murder it became ''material to know'' whether on the evening of September 18th and prior to the shooting there was any arrangement, agreement, or understanding between the said defendant Alice Woodcock and the said Edgar Woodcock or between the said defendant, said Edgar Woodcock and Cooper or between the said Edgar Woodcock and Cooper to the effect that the said Edgar Woodcock and Cooper, or either of them, were going, or intended to go, to the State Mining Bureau that night. Also that it became ''material to know'' whether on that evening and before the shooting anything was said between the said defendant Alice Woodcock *and* said Edgar Woodcock *and* said Warren G. Cooper *or in the presence of said Warren G. Cooper* to the effect that they intended to go to said Mining Bureau. It is then alleged that after having been sworn as a witness in said trial the defendant Alice Woodcock testified that her husband came home from the Mining Bureau for dinner and that *when he came in* he said: ''Dearie, I will have to go back to the bureau to-night, I have an exhibit to get out for some county fair. . . . Warren Cooper is going down with me to the bureau to-night to help pack the exhibit because it must be gotten off early in the morning.'' She then testified that they were just finishing dinner when Cooper came in and that ''after talking a few minutes with the boys'' her husband asked her if she would go to the library to get him a book; that she replied that she did not feel well and would get

the book the next day, but that her husband answered that if she had a headache it was well to go out and take a little walk and that "Warren and I will walk over as far as the library with you on this way to the bureau." It is then alleged that in truth and in fact there was no arrangement or understanding between the defendant Alice Woodcock *and* Edgar Woodcock *and* said Cooper, nor between said Edgar Woodcock *and* Cooper to the effect that Woodcock and Cooper were going, or intended to go, to the Mining Bureau on that night, and that in truth and in fact nothing was said between the said defendant and the said Edgar Woodcock *and* said Cooper to the effect that Woodcock and Cooper intended to go to the bureau, and that nothing was said "between the said defendant Alice Woodcock and said Edgar Woodcock *in the presence of said Warren G. Cooper* to the effect that the said Edgar Woodcock and said Cooper" intended to go to the bureau that night.

If all that is alleged in the indictment and all that was testified to by the defendant at the trial should be true, there is not a particle of testimony referred to in the indictment which even tends to intimate that Edgar Woodcock and Cooper had "any arrangement, agreement, or understanding" to go to the Mining Bureau that night. All that the defendant is alleged to have testified to at the trial was that *her husband had told her* that they would do so. There is, therefore, no conflict between this portion of the testimony and the state of facts which the indictment alleges was true.

As to the second portion of the testimony alleged to be false, relating to the statement of Edgar Woodcock to his wife that he and Cooper would walk over to the library with her on the way to the bureau, there is no inconsistency between the testimony complained of and the facts alleged to be true. It is not alleged that the defendant testified that this statement was made to her by her husband in the presence of Cooper, or that she at any time testified that there was any arrangement, agreement, or understanding among the three that Cooper and her husband should go to the Mining Bureau that night. Her testimony was merely that her husband had made that statement to her, and so far as the indictment is concerned

(and this is supported by all the evidence), it was made outside of the presence and hearing of Cooper.

The indictment alleges that nothing was said between the said defendant Alice Woodcock and said Edgar Woodcock *in the presence of said Warren G. Cooper* to the effect that Cooper and Woodcock intended to go to the Mining Bureau that night. As at no stage of her testimony did the defendant testify that anything was said between herself and husband in the presence of Cooper regarding their intention to go to the Mining Bureau, and as the indictment does not even attempt to allege that she did so testify, or endeavor to create that impression, this portion of the count, like those preceding it, fails to allege the commission of any offense.

(2) The evidence presented in support of the allegations of this count is wholly insufficient to sustain the verdict. The evidence upon which the prosecution relied is the testimony of Cooper to the effect that nothing was said to him or to Mr. Woodcock *by* Mrs. Woodcock with reference to going to the Mining Bureau that night and that there was no arrangement between him and Woodcock in reference thereto, and that nothing was said to Mrs. Woodcock in reference thereto *in his presence*. All this testimony might be true, but it does not falsify any of the testimony of defendant assigned as untrue.

In addition to this, if any portion of the testimony of Cooper could be taken as even remotely falsifying the testimony of the defendant assigned as perjurious in this count, there is not a particle of corroboration of that testimony. All that respondent urges in this behalf is (a) that Woodcock carried a gun that night when they went on the street; (b) that he and Cooper did not go to the Mining Bureau; and (c) the fact that they paraded up and down Market Street. Taking the test announced in *People* v. *Morton,* 139 Cal. 719, 724, [73 Pac. 609], and eliminating from the case the testimony of Cooper—the only witness offered in support of the allegations of the indictment—the question arises, taking these three facts as true, would they tend to connect the defendant with the commission of the offense charged. That is to say, do they tend to prove that she testified falsely when she detailed the conversation between her husband and herself. As to Wood-

cock carrying a gun, it was shown that he was a deputy sheriff and entitled to carry one, and that frequently when going out upon the streets at night he first strapped on a gun and that particularly just a few nights previous to this occasion when he and Cooper went out for a walk, *at a time when the defendant did not accompany them,* both Cooper and Woodcock had strapped on guns before they left the apartment. As to the second corroborating fact, it is plain that, no matter what intentions they might have had, the reason that Cooper and Woodcock did not go to the Mining Bureau that night was that immediately following the shooting they were both taken to the police station and placed under confinement. As to the third alleged corroborating fact—that they paraded up and down Market Street—the evidence in this connection could show nothing more than the possible change of plans (if such a plan had been made) following the assault upon the young man in the automobile at Fulton and Larkin Streets, which occurred on the first trip from the apartment to the library, a trip upon which both witnesses testified that both Cooper and Woodcock agreed to accompany defendant before they left the apartment.

## Second Count.

The portion of the indictment relating to the second count alleges that during the course of the trial of Edgar Woodcock for murder it became material to know whether on the evening the shooting occurred there was an agreement between the three parties to go out upon the public streets on a joint enterprise or undertaking. It is then alleged that defendant testified that, after the defendant left Woodcock and Cooper at the corner of Fulton and Larkin Streets, where the assault upon the young man in the automobile occurred, she walked on to and into the public library and that when she came out of the library she "was surprised to find that Edgar was there waiting for me." It is not alleged that the testimony complained of was material to the subject matter of the inquiry or that it might have affected such proceeding.

Assuming, for the time, that the testimony of a witness as to his or her state of mind can be made the basis of an indictment for perjury, the same rules of evidence referred

to in the discussion of the first count are applicable here. The defendant testified that when she came out of the library she was surprised to find that her husband was waiting for her. The prosecution claims that this testimony was false, but not a particle of evidence was offered tending to prove its falsity. Even if the evidence of the circumstances be taken as falsifying her testimony of surprise, the prosecution failed to meet the demands of the statute that the direct testimony of one witness at least is necessary to prove perjury. The only defense of the verdict upon this count urged by respondent on this appeal is that the statement of the defendant, made to a police officer immediately following the shooting, is incompatible with the testimony given at the time of her husband's trial. The portion of the statement relied on is: "I went into the library. I was not in the library over fifteen minutes. As I came out I met my husband and I walked down Larkin Street." There is nothing inculpatory in the statement and nothing therein inconsistent with the testimony assigned in the indictment as perjurious. The allegations of this count went to the jury without any proof.

### Third Count.

In the third count of the indictment it is alleged that during the course of the trial of Edgar Woodcock it became material to know what were the reasons which prompted the defendant to walk down Market Street the second time after she had purchased a magazine in a store at the corner of Gough and Market Streets, and whether the three walked down Market Street at that time for the purpose of finding a policeman. The testimony set out in the indictment and which is alleged to have been false was to the effect that after the defendant had purchased a magazine in a store at the corner of Gough and Market Streets her husband asked if either she or Cooper had seen a policeman during their walk that evening, and that when she told him that she had not he suggested that they walk down Market Street again as far as Larkin to see if a policeman was on the beat. It is then alleged (1) that they did not walk down Market Street at that time for the purpose of looking for or finding a policeman; (2) that they did thus walk down Market Street in pursuance of a

joint enterprise entered into between them previously; (3) that defendant's husband did not ask her or Cooper, or either of them, whether they had seen a policeman that night, and (4) that defendant's husband did not say to Cooper or defendant, or either of them, that they should walk back on Market Street a second time for the purpose of finding a policeman.

The trial court instructed the jury that though each count contained considerable testimony given by the defendant while she was a witness in the murder case, it was necessary for the prosecution to prove only such parts or portions of the testimony set forth in each count of the indictment as is by each count alleged to be false or untrue. The case was tried upon this theory, yet the indictment does not, as to the third count, allege that any particular portion of the testimony of the defendant was untrue. In order to prove its case under that count it was necessary for the prosecution to show that the three walked down Market Street the second time in pursuance of a former understanding and not for the purpose of looking for a policeman, and that the defendant's husband said nothing to her at that time either inquiring whether she had seen a policeman or suggesting that they walk down Market Street a second time for the purpose of finding a policeman.

The only testimony in support of the allegations in this count is that of Cooper, which attacked the truth of the defendant's testimony only to the extent that he did not hear anything said to the defendant by Woodcock at that time in reference to finding a policeman. This testimony, meager though it is, is weakened by his explanation that as the three stood on the corner something was said about mailing a letter and that he took the letter across the street and mailed it, and that there was other conversation between Woodcock and the defendant which he did not hear —in fact, that he did not hear *most* of the conversation between Woodcock and defendant at that time.

As to the assignments relating to the purposes directing their second walk down Market Street and the statements made by Woodcock to the defendant beyond the presence and hearing of Cooper, there is no direct evidence to support the allegations of the indictment.

### Fifth Count.

In the fifth count it is alleged that during the course of the murder trial it became material to know the reasons why defendant had signed a statement in the presence of a police officer and whether or not the said statement was substantially true or false. The testimony of the defendant assigned as false was given in answer to a question as to what she had said in that statement. It is as follows: "Well, that statement appears in this statement of mine and I was told that unless I made the statement to the police or the detective department that I could not see my husband." It is then alleged that the said statement had been voluntarily made by the defendant and that she was not told by a police officer that if she refused to make or sign the statement she would not be allowed to see her husband.

The only witness called to prove the falsity of defendant's testimony was Police Officer Hippely. The only evidence he gave bearing on the subject matter of the inquiry was in answer to the following question: "Did you threaten her, or did anybody threaten her, that if she did not sign that statement that she could not see her husband?" To which he answered, "No, sir." Two other police officers were called to the stand by the prosecution to answer clearly irrelevant, incompetent, and immaterial questions relating to the personal appearance and conduct of the defendant following her husband's arrest, but their attention was not directed to the material inquiry relating to the allegations of this count.

Respondent's only answer to the attack upon this count of the indictment is that the testimony of Officer Hippely was corroborated by that of Dorman and Kennedy and by defendant's own assertion, found in the concluding sentence of her written statement to the effect that it was true and voluntary and made without fear, threat, or promise of reward. As to the testimony of the two police officers, the record clearly shows that they did not, and could not, corroborate Officer Hippely because they were not present at any time during the taking or signing of the statement. As to the assertion in the statement itself, assuming for the time the correctness of respondent's argument that

the statutory demand for two witnesses in a perjury case can be met by balancing the unsworn statement of the defendant against the sworn testimony alleged to be false, a court and jury would be without the common knowledge of men if they held that a statement of this nature demanded by the police from a person in custody was in all cases made voluntarily and without fear, threat, or promise of reward, because it is well known that all persons making a statement to the police while under surveillance are compelled, above all other things, to include that assertion in their statement. (*People* v. *Quan Gim Gow,* 23 Cal. App. 507, [38 Pac. 918].)

### *Sixth Count.*

In this count the indictment alleges that during the course of the murder trial it became material to know the reasons why, on the evening of September 18th, the defendant walked upon the public streets of San Francisco in advance of her husband and Cooper, and whether this manner of walking was not followed in pursuance of an arrangement theretofore had between the defendant and her husband and said Cooper. The indictment contains several pages of testimony alleged to have been given by the defendant during the course of that trial but does not assign any particular portion of it as false. The nearest approach to an assignment of perjury seems to be that portion of the indictment wherein it is alleged that the defendant testified as follows: "Q. The three of you [referring to the defendant Alice Woodcock, said Edgar Woodcock, and said Warren G. Cooper] started together; how long did you remain together? A. As I told you yesterday afternoon, Warren Cooper and my husband were having a confidential chat, and rather than obtrude upon the two men I stepped just ahead of them." It is then alleged that the three did in fact walk upon the public streets that evening in pursuance of an arrangement theretofore had between them that the defendant should walk in advance of her husband and Cooper. It is also alleged that it was not true that they walked in that manner because defendant's husband and Cooper were talking confidentially or because they were talking.

There was no testimony, either direct or circumstantial, in support of the allegations of the indictment contained in this count. The only witness called for the purpose of impeaching the defendant on this issue was Cooper.

He testified that as the three came out of the apartment Woodcock told the defendant to go on ahead and that he and Cooper would follow; *that there was no plan relating to the manner of walking organized that he knew of;* that nothing was said relating to the manner of walking in the presence of the defendant at any time so far as he knew; and that as they came out of the library Woodcock told his wife to go on as before. There is no possible inference from any portion of Cooper's testimony contradicting the direct testimony of the defendant to the effect that the reason that she walked on ahead of the other two was that they were talking confidentially and she did not want to interfere with their conversation. There was no evidence tending to prove that she took part in any agreement which the other two might have made relating to their manner of walking that evening or that Cooper and Woodcock were not in fact talking confidentially and gave her to understand that that was the reason she was requested to walk ahead. When defendant's counsel, on cross-examination of the witness Cooper, asked the witness if it were true that he and Woodcock were in fact engaged in confidential conversation at that time, the trial court, upon the objection of the district attorney, refused to permit him to answer.

The only evidence cited by respondent as tending to prove the issues upon this count is the assertion found in defendant's written statement, given on the night of her husband's arrest, to the effect that her husband instructed her to go to the library and get a book for him; that he would be right behind her; and that "if anyone spoke to me or annoyed me to turn around." But there is nothing inculpatory or inconsistent in this statement of the defendant. It is entirely consistent with the testimony of Cooper that as they reached the street in front of their apartment Woodcock told the defendant to walk on ahead and that they would follow, but that there was no prearranged plan at any time relating to the particular manner in which they should proceed that night. Outside of the possible inconsistencies appearing in the written statement

which the defendant gave to the police, there is neither direct nor circumstantial evidence tending to prove the allegations of this count.

### Seventh Count.

In the seventh count of the indictment it is alleged that during the course of the trial of Edgar Woodcock for murder it became material to know whether on the evening of September 18th, at the time said Edgar Woodcock assaulted a certain young man driving an automobile at Larkin and Grove Streets, the said defendant said anything to her husband. The indictment details a portion of the testimony of the defendant, given in the course of the murder trial, to the effect that she did not know how many times her husband struck the young man, but that after he struck him she went on to the library without approaching or speaking to her husband. It is alleged that this testimony was untrue, because the defendant did approach her husband and told him that the young man had been sufficiently punished. It is a fertile imagination indeed that can see any materiality in this testimony affecting the subject matter at issue in the murder trial. But, passing this, the testimony offered in support of the allegations of this count of the indictment not only fails to falsify this portion of defendant's testimony, but, if anything, proves its truth. Two witnesses were called to falsify the testimony of defendant. The first witness, Cooper, testified that after Woodcock had struck the young man several blows Mrs. Woodcock came up near the crowd of people who had gathered there and said that she thought the young man had had enough, but that he did not know whether she said that to Woodcock or to himself as she did not come close; that she then turned and went into the library while he and Woodcock put the young fellow into the machine. He also testified that though the machine was probably fifty or seventy-five feet east of Larkin on Fulton Street he did not see the defendant leave the corner of Larkin and Fulton. The other witness whose testimony respondent cites as corroborating that of Cooper and going to prove the falsity of defendant's testimony was a man by the name of Head. The only portion of his testimony which relates to the allegations of this count is that when he ap-

proached the point where the assault was taking place he noticed a woman resembling Mrs. Woodcock standing on the corner of Larkin and Fulton Streets, some fifty or seventy-five feet from where her husband stood; that she *did not approach* her husband *or speak to him* and that after the fracas was over he saw that she was gone. The allegations of this count of the indictment went to the jury without a shred of evidence to sustain them.

### Eighth Count.

In the eighth count of the indictment it is alleged that during the course of the trial of Edgar Woodcock it became material to know why the defendant knew that on the evening of September 18th her husband and Cooper were following behind her as they walked along the streets and whether or not there was any arrangement, agreement, or understanding between them that they should so walk that evening. Testimony of the defendant given at that trial is set forth in this count to the effect that the defendant knew that Cooper and her husband were behind her without turning around from time to time to see whether they followed. Without assigning any of this testimony as false or material, the indictment alleges that Edgar Woodcock instructed the defendant that she should go forth upon the streets, apparently unattended and alone, and that he and Cooper would walk behind and following her and that an arrangement, agreement, and understanding had been entered into between defendant, her husband, and Cooper to that effect. Though the trial court instructed the jury that only certain portions of the testimony set out in this count were assigned as perjury, the jury was not instructed as to what these certain portions were, and it is impossible to determine that from any analysis of the pleading.

Passing the imperfections of the indictment, it is clear that there is no evidence to support the allegations of this count. Cooper was the only witness called. The only portion of his testimony bearing upon the allegations of this count was that as the three came out of the apartment Woodcock told the defendant to go ahead and that he and Cooper would follow, but he further testified that "there was no plan organized [as to the manner of their walking]

that he knew of." Furthermore, his testimony is uncorroborated.

### Tenth Count.

In the tenth count of the indictment it is alleged that during the course of the trial of Edgar . Woodcock it became material to know why the defendant, with Cooper and her husband, walked down easterly on Market Street the second time on the evening of September 18th and whether the reason for said walk was for the purpose of finding a policeman. The indictment details a portion of the testimony of the defendant given at that trial to the effect that when they stopped at the corner of Market and Gough Streets on their first trip west on Market Street they spoke of not having noticed a police officer on the previous trip to the library and that they then turned and walked east on Market Street to see if there were any police officers on the street.

The allegations of this count are practically a duplication of those found in the third count and the same testimony is relied on by the respondent to prove the falsity of the testimony of defendant set forth in this count. What has been said in the discussion of the third count concerning the form of the indictment and the testimony of Cooper and the want of corroboration applies equally to the testimony in support of the allegations of this count. Outside of Cooper's testimony that nothing was said in his presence relating to their walking down Market Street a second time to see if they could find a police officer, there is neither direct nor circumstantial evidence to sustain the verdict on this count.

### Eleventh Count.

In the eleventh count of the indictment it is  alleged that in the course of the trial of Edgar Woodcock it became material to know whether or not when defendant approached and stepped off the curb at the corner of Van Ness Avenue and Market Street on the evening of September 18th she either turned around or looked back or smiled at any man or men. The only portion of the testimony given by the defendant at that trial which is set forth in this count follows: "Q. Now, did you as you stepped off the curb at the corner of Van Ness Avenue and Market Street, turn

around and look back and smile at anyone? A. No, Mr. Brennan, I did not.'' Though it is alleged that the defendant knew that this testimony was false, the indictment does not allege that it was in fact false. On the other hand, it is alleged that as the defendant approached the curb at the corner of Van Ness Avenue and Market Street *or* approached approximately the said neighborhood or locality, *or* as she stepped off the curb at the corner of Van Ness Avenue and Market Street *or* was in approximately that neighborhood or locality she did turn around and look back at men and smiled at several men.

The record shows beyond doubt that the question and answer assigned in this count were a part of the direct examination of the defendant giving a detailed account of the course taken by the defendant, her husband, and Cooper on the night of September 18th. During this inquiry questions were asked and answers given taking the defendant over the course from the time she left her apartments across Market Street, down Market in an easterly direction to Larkin, thence over Larkin to the library, back Larkin to Market, thence west on Market to Gough, thence east again on Market to Larkin, and thence west on Market to the place where the shooting occurred. The question and answer assigned related to the second or last trip west on Market and immediately preceding the shooting.

The witness McLellan, called by the prosecution, testified that he saw the defendant on her *first* trip west a little after 8 o'clock and that as two men passed her she was smiling and turned around a little bit. He also testified that about 9 o'clock of the same evening he again saw her going west on Market Street and that while she had a smile on her face *she was looking straight ahead.* Another witness, Amner, called by the prosecution, testified that either on her *first trip east* on Market or on her *first trip west* on Market he saw the defendant smile as she passed the witness McLellan and that that was the only time he saw her smile that evening. The witness Abbott testified that, while he was standing at the corner of Van Ness Avenue and Market Street near the water hydrant with the witness McLellan, Edgar Woodcock approached him and asked if they were discussing ''that lady''; that he then noticed the defendant some twenty feet in advance as she

approached the monument in the center of Van Ness Avenue; that as she was passing the monument she looked back and he could see that there was a smile on her face. Notwithstanding the fact that he had previously testified that he did not see the defendant until after Edgar Woodcock approached and spoke to him while he was standing near the curb and that she was then some twenty feet in advance of Woodcock, he testified that he saw her just as she left the curb and that she then had a smile on her face. But, in any event, he was detailing what he saw on the *first* trip west. The witness Gilger testified that he saw the defendant smile as she passed the cigar-store at the corner of Van Ness and Market on her *first* trip west that evening and that as she approached the monument in the middle of Van Ness Avenue he saw her turn around and look back. The witness Cooper placed the incident of Edgar Woodcock speaking to a street-car man as occurring on the first trip west on Market Street. In point of time this preceded by about a half hour or more the time concerning which the defendant was testifying in that portion of her examination which is attacked in this count. There is, therefore, no testimony tending to prove that the defendant, on her *second* trip west on Market Street as she stepped off the curb at the corner of Van Ness Avenue and Market Street, turned around and looked back and smiled at anyone. The only testimony offered by the prosecution as to what occurred at the time concerning which the defendant testified is the testimony of the witness McLellan to the effect that the second time that the defendant walked west on Market Street that evening she was looking straight ahead.

Respondent argues that "perjury consists in the misrepresentation on the witness-stand as to facts, by whatever language these facts may be conveyed." On this basis it is contended in effect that when the defendant answered the question relating to her conduct on her second trip west on Market Street she was guilty of perjury because she did not go on to explain what had occurred on her first trip, a half hour earlier. But if her testimony was wanted on such fact, the proper course was to ask for it. It was not for the witness to volunteer.

The indictment fails to state sufficient facts in this count and the evidence does not prove the falsity of the testimony assigned.

[4] Defendant assigns numerous errors relating to the instructions to the jury and matters occurring during the course of the trial. Particular criticism is made of the error of the trial court in assuming facts as proved which were not supported by the evidence. For instance, throughout the instructions the court referred to an arrangement, agreement or understanding between the defendant and Edgar Woodcock and Cooper to the effect that the three should go upon the public streets of San Francisco on a joint enterprise or undertaking on the night of September 18th. This, of course, was the theory of the prosecution in the murder case, but no evidence was offered in support of this theory in the present case. The nearest approach to evidence of that character was the inadmissible testimony of Cooper to the effect that on the afternoon of the 18th of September *he* and *Edgar Woodcock* had entered into some arrangement between themselves, but no evidence was offered tending to connect the defendant with any such agreement, arrangement, or understanding. This language in the instructions carried the inference to the jury that the court believed that the existence of such an agreement, arrangement, or understanding had been proved by the prosecution. This was error in view of section 19, article VI, of the constitution, which provides that judges shall not charge juries with respect to matters of fact. (*People* v. *Messersmith,* 61 Cal. 246, 248; *People* v. *Williams,* 17 Cal. 142, 147; *People* v. *Choynski,* 95 Cal. 640, 643, [30 Pac. 791].) That prejudice resulted from this instruction is too plain to question, because if the prosecution was unable to prove this theory, its main case fell. With the intimation on the part of the trial court that the facts supporting the prosecution's theory did in fact exist, the inferences which the law permits the jury to draw from the testimony were drawn by the court itself and embodied in the instructions in such a way that the jury must necessarily have assumed that the theory was a fact proved.

Criticism is also made of the instruction to the jury to the effect that if it found that the defendant testified in

the murder case in substance and effect that there was an arrangement, agreement, or understanding on the evening of September 18th between Cooper, her husband, and herself to the effect that Cooper and her husband were going to the Mining Bureau that evening and that something was said to that effect between the three, and that if the jury further found that in truth and in fact there was no such arrangement between them and nothing was said between defendant and her husband in the presence of Cooper relating to their going to the Mining Bureau that night, then the jury should find the defendant guilty as charged in the first count. The vice of this instruction is that the indictment did not charge the defendant with having testified that there was any arrangement or agreement between the three of them to the effect that Cooper and her husband should go to the Mining Bureau that night and did not charge her with having testified that anything was said in regard thereto in Cooper's presence. The court thus instructed the jury that if they found that the defendant had testified falsely to something with which she was not charged in the indictment it should find her guilty upon this count.

Defendant complains of the special instruction given to the jury in relation to the eleventh count to the effect that, if the jury found as the defendant approached the curb at the corner of Van Ness Avenue and Market Street or was in approximately the neighborhood or locality and that, before the said Edward C. Kelly was shot and killed, she turned around and looked back at a man or men or smiled at a man or men, the jury should find her guilty. This instruction, like the one first discussed, invades the province of the jury to pass upon the evidence. The defense to this count was that the testimony assigned as perjurious related solely to the second or last trip west on Market Street. The testimony offered at the trial of this case related to the first trip west on Market Street. It was, therefore, the province of the jury to determine whether the testimony of the defendant assigned as perjurious did relate to the second trip only and whether she did in fact on that second trip, while stepping off the curb at the corner of Van Ness Avenue and Market Street, turn around, look back, and smile at any man. By the

court's instructions the jury was told that, if it found that the defendant while in the neighborhood or locality of Van Ness Avenue and Market Street turned around and smiled at a man or men (not necessarily on her last trip west on Market Street or even at any time on the night in question), that fact would prove the falsity of her testimony and the jury should accordingly find her guilty.

Similar criticism is made of the special instructions relating to the eighth count wherein the court assumed that the jury could find that there was an arrangement, agreement, and understanding between the three parties to the effect that the defendant should go forth upon the streets of San Francisco that night apparently unattended and alone and that her husband and Cooper would walk behind her and that the entire course of their walk that evening was in pursuance of that agreement and understanding, though no evidence of such an agreement was presented to the jury. The only evidence offered on this subject was that of Cooper, who in answer to an inquiry as to the arrangement for their manner of walking that evening said "there was no plan organized that he knew of."

Error is assigned in the refusal of the court to give certain instructions requested by the defendant. Some of the matters included in these rejected instructions appeared in the general instructions given by the court. Other matters of importance to the defendant appearing in these instructions were not given to the jury. It would serve no purpose at this time to discuss these various instructions. The trial court apparently did not accept defendant's view of the law as to the *quantum* of proof necessary in a case of this kind, and as a result the instructions given to the jury are confusing and conflicting upon this subject. Thus the court refused to give to the jury the following instruction requested by defendant: "No amount of corroboration will be sufficient to justify the conviction of one accused of perjury, where the testimony of the witness to be corroborated is uncertain in negativing the alleged perjurious testimony of the accused. If the testimony of a single witness produced to prove perjury does not prove with certainty and without doubt that a contrary state of facts existed than that shown by the alleged perjurious testimony the accused must be found not guilty."

This correctly stated the law and should have been given. (30 Cyc. 1455; *People* v. *Smith,* 3 Cal. App. 68, [84 Pac. 452].)

Criticism is also made of the following instruction: "You are further instructed that although as men you may sympathize with those who suffer, yet as *honest* men, bound by your oaths to administer judgment according to the law and the evidence, you should not act upon your sympathies and in contravention of the proof. Mercy does not belong to you. No question of mercy, sentiment, sympathy, compassion, or anything else resides with you. . . . " This instruction, it is argued, had a prejudicial effect on the minds of the jury. The defendant being the only one on trial, it was for her alone that sympathy or mercy might be expected. To instruct the jury that "mercy does not belong to you" necessarily carried to the jury the impression that the court, believing the defendant guilty and expecting the jury to convict her, could alone extend sympathy or mercy to the defendant.

It is said in argument that these instructions are taken from the cases of *People* v. *Bojorquez,* 35 Cal. App. 350, [169 Pac. 922], and *People* v. *Hawes,* 98 Cal. 648, [33 Pac. 791]. It is true that the latter instruction appears in the decision of the Bojorquez case, but a reference to the decision would plainly show that the appellate court did not approve it.

Numerous other objections are made to the rulings of the court in sustaining or overruling objections to particular questions, and to the manner assumed by the court in making such rulings as being prejudicial to the defendant. It is unnecessary to consider these objections as it is not likely that they will again occur.

The defendant here is charged with having given false testimony, certain portions of her testimony being assigned by the prosecution as constituting perjury. Nothing that is said herein should be construed as implying that the testimony which she gave was in fact true. All that is held is that she was not legally convicted.

The judgment is reversed, with instructions to the trial court to grant the defendant a new trial on counts numbered second, third, fifth, and tenth, and to dismiss the

indictment as to counts numbered first, sixth, seventh, eighth, and eleventh.

Sturtevant, J., and Langdon, P. J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 29, 1921, and the following opinion then rendered thereon:

THE COURT.—[5] The denial of the application for a hearing in this court after decision by the district court of appeal of the first appellate district, division two, is not to be taken as indicating that this court concurs in the view of the district court of appeal that the trial court erred in refusing the requested instruction quoted in the opinion. This proposed instruction was erroneous and was properly refused. [6] Nor does this court believe that the giving of the instruction last discussed in the opinion constituted error.

The application for a hearing in this court is denied.

Angellotti, C. J., Shaw, J., Wilbur, J., Lennon, J., Olney, J., and Sloane, J., concurred.

LAWLOR, J., Dissenting.—I dissent. None of the points relied upon by the district court of appeal for the reversal of the judgment has any substantial merit. The decision is opposed to the well-settled law of this state on questions of pleading, *quantum* of proof, and instructions in cases of perjury, and is certain to prove a mischievous precedent. It furnishes another instance of purely technical reasoning, which the rule of decision in the constitution was intended to obviate, totally defeating the ends of justice, for we have before us the statement of the attorney-general that because of the death of Warren Cooper, the principal witness for the state, and of Lester Dorman, the officer in the case, the denial of the petition will end the prosecution.

The petition should be granted.