[Crim. No. 4339.   In Bank.—April 21, 1941.]

THE PEOPLE, Respondent, v. JOSEPH E. SHAW et al., Appellants.

Cantillon & Glover, Richard H. Cantillon and John E. Glover for Appellant Shaw.

Morris Lavine for Appellant Cormack.

Earl Warren, Attorney-General, R. S. McLaughlin, Deputy Attorney-General, John F. Dockweiler and Buron Fitts, District Attorneys, Eugene D. Williams, Chief Deputy, and John Barnes, Deputy District Attorney, for Respondent.

THE COURT.—A hearing was granted herein after decision in the District Court of Appeal of the Second Appellate District, Division One, to permit a closer study of the case. After an examination of the record and a consideration of the points involved, we approve the opinion of that Court prepared by Mr. Presiding Justice York, which, with some interpolation and additional comment, is adopted as the opinion of this Court, as follows:

"By an indictment containing sixty-six counts, appellants were charged with violations of section 113 of the Penal Code, in that upon certain stated dates they 'did wilfully, unlawfully and feloniously aid and abet, advise and encourage, and by threats, menaces, command and coercion, compel and cause one Glenn G. Gravatt, who was then and there the duly and regularly qualified and acting manager of the civil service department of the city government of the city of Los Angeles, California, and other employees in said civil service department, to mutilate, deface, alter and falsify' certain civil service records then in the custody of said Gravatt and the other employees of said department, who were officers of the city of Los Angeles.

"Each odd numbered count referred to the falsification of part of a report of a civil service examination pertaining to the mark, grade and rank of a named applicant, which report was known and designated by the civil service department as 'rough sheet'. Each even numbered count of the indictment referred to the falsification of the grade notations which were written on the back of the application of the particularly named candidate in consonance with the notations entered on the so-called 'rough sheet'.

"The charges of the indictment related to five examinations conducted by the civil service department as follows:

"1. Counts 1 to 16, inclusive, to changes made in the oral interview grades of eight named candidates who took an examination for the position of engineer in the fire department prior to December 16, 1936, to wit: on October 30, 1936;

"2. Counts 17 to 22, inclusive, had reference to changes made in the oral interview grades of three candidates who were examined for the position of captain of the fire department approximately on April 10, 1937;

"3. Counts 23 to 38, inclusive, referred to falsification of oral interview grades of eight candidates for the position of

auto fireman, an examination for which was conducted on July 29, 1937;

"4. Counts 39 to 50, inclusive, related to the falsification of oral interview grades of six candidates who took an examination for the position of fireman, held on or about January 8, 1938;

"5. Counts 51 to 66, inclusive, had reference to the changes made in the oral interview grades of eight candidates for the position of motor-cycle officer of the police department, an examination for which was held on or about May 8, 1937.

"In each instance it is alleged that the oral interview grade was falsely entered on the so-called 'rough sheet' and upon the back of the application of the particularly named candidate.

"At the conclusion of the trial, the jury returned its verdicts finding appellants guilty on sixty-three counts, as charged in the indictment, verdicts of not guilty having been returned to counts 42, 44 and 50. Appellants' motions for new trial and in arrest of judgments were denied, and judgments of conviction were pronounced. The sentences on the individual counts composing each of the five groups were made to run concurrently, and the sentences on the five groups were made to run consecutively, there being five consecutive sentences imposed upon each appellant.

"This appeal is prosecuted from the judgments of conviction, from the orders denying motions for new trial, and from the order denying the objections of each appellant to the pronouncement and imposition of judgment and sentence.

"It is contended in the twenty assignments of error set forth in appellants' briefs that (1) the evidence is insufficient to sustain a charge under section 113 of the Penal Code for the reason that said section has been superseded by section 118 of article IX of the charter of the city of Los Angeles (Stats. 1925, p. 1068); (2) the application blanks and rough sheets were not records within the meaning of section 113, *supra;* (3) the evidence is insufficient to support the judgments of conviction for the reason that appellants were convicted upon the testimony of accomplices without the corroboration required by section 1111 of the Penal Code; (4) the court erred in its rulings as to the admission and rejection of evidence, and in its instructions to the jury, as well as in its refusal to give certain instructions; (5) the court

erred in refusing to allow appellants to impeach the testimony of the witness Gravatt; (6) there was misconduct on the part of the deputy district attorney which amounted to prejudicial error; (7) it was error to impose upon appellants a sentence under section 113 of the Penal Code.

"It is disclosed by the evidence that at the time in question under the charter of the city of Los Angeles the civil service department was presided over by a board of five commissioners, and that the business of the department was to examine the qualifications and select applicants for positions of employment in the classified civil service. The department was generally divided into two divisions, one an examining division and the other a clerical division, both of which were under the supervision and control of the general manager, Glenn G. Gravatt.

"When employees were needed to fill positions in any of the governmental departments of the city, the board of civil service commissioners would be duly notified and they in turn, through consultation with the head of the department requiring such employees, would determine the requisite qualifications for the particular employment. The general manager would then be instructed to arrange to conduct an examination to test the applicants' qualifications, and the examination was publicly advertised. Applicants were required to fill out application blanks setting forth their age, education and experience, and these blanks were filed with the clerical division. Before the time set for the written examination, such applicants were notified when and where to appear therefor.

"Each civil service test was divided into two phases, one consisting of a written examination and the other of an oral interview. The written examination was conducted first, whereupon the papers were graded and the grades received by the applicants were forwarded to the clerical division and there entered in pencil on a document known as the 'rough sheet', as well as on the back of each candidate's written application. Those candidates receiving a passing grade in the written examination were summoned to the civil service department, to be interviewed by one of the examiners of the department, who wrote on a memorandum pad called the 'oral sheet' his appraisal of the candidate's education and experience. Thereafter, these oral sheets were forwarded

to the clerical division and the marks so entered thereupon were placed in the proper column in pencil on the 'rough sheet', opposite the grades representing the result of the written examination. The mark received on the oral interview was then noted on the back of the written application previously filed by the candidate.

"There was then noted and added to these oral and written grades in the proper columns such credit as the particular applicant might be entitled to by reason of seniority or for military service, and a general average computed by the clerical staff which was entered in pencil in the proper column on the rough sheet. The rank of the applicant was determined from a computation of the general averages, and his numbered place in rank in the order of his relative excellence was entered in pencil upon the rough sheet, which was then delivered to the general manager for inspection, review and approval. Under the rules of the commission, the general manager also occupied the office of chief examiner. If the general manager approved the gradings on the rough sheet he returned it to the clerical division with instructions that a typewritten sheet, designated as the 'smooth sheet' be prepared therefrom and forwarded to the board of civil service commissioners for consideration and approval. It appears that if the general manager disapproved the contents of the rough sheet, it was within his discretion to return it to the examiners or the clerical division with instructions to make any proper corrections or changes, with corresponding changes on the back of the applications. The smooth sheet was not prepared until the general manager, as chief examiner, first approved the grades appearing on the rough sheet. Upon presentation of the smooth sheet to the board, it was duly published, and candidates dissatisfied with their grades were notified to file written protests within a certain prescribed period of time. When that period had elapsed the board approved the smooth sheet from which would then be prepared a list of persons eligible for appointment to positions in the classified civil service, and subsequently appointments were made therefrom in the order of rank obtained by the respective applicants as the city required their services.

"Appellants were not charged with actual participation in the alteration and changing of the grades and marks in

question, but with having aided and abetted, advised and encouraged Glenn G. Gravatt and other employees of the civil service department to make such changes."

The said Glenn G. Gravatt, an admitted "accomplice and who was the main witness for the prosecution, had been employed by the city in various capacities over a period of twenty years, and on April 7, 1933, he became the general manager and chief examiner of the civil service department. On July 1, 1933, Frank Shaw took office as mayor and shortly thereafter Gravatt met appellant Shaw, the mayor's brother and secretary, at which time appellant Cormack was a member of the board of civil service commissioners.

"Gravatt was named in the indictment as the principal actor and it was his testimony which formed the background of the instant convictions and judgments. He testified that around the first of October, 1933, appellant Shaw called him to his office on the first floor of the city hall, at which time the following conversation took place between them:

" 'Well, Mr. Shaw said that he had some friends who had assisted the Mayor in his recent campaign, and said that he was very anxious to do something for them toward getting them a job with the city under civil service; and he asked me what could be done to help them. I said I didn't know anything that could be done, that I didn't know of any short cuts in civil service positions. So Mr. Shaw said, "Well, just what is the procedure in connection with getting a civil service job?" and I said, "Well, we accept applications from candidates who meet the qualifications and the specifications that are set up by the Commission, and following that we hold a written examination, and when those papers are marked and graded, we have an oral interview for those candidates who hold a sufficiently high grade in the written portion of the examination to be called for the oral interview." Mr. Shaw said, "Well, couldn't we make some changes in the grades?" and I said, "Well, I didn't see how that could be possible." I said, "The marks are entered on a number of different papers and documents and it is not any one man's job but goes through several hands and goes through several clerks and several examiners, and all of these papers and marks on the—all the grades on the different papers have to correspond." And Mr. Shaw said, "Well, I didn't mean so much the written part of the examination."

He said, "Couldn't some change be made in the oral part of the examination?" And I said, "I don't know." And he said, "Well, isn't it a fact that only one examiner gives the oral examination?" I said, "That is usually the case." He said, "Wouldn't it be a very easy and simple matter to make a change in the oral grade?" I said, "Well, I guess it could be done, but I don't like to do it. I have never done anything like that before." So Mr. Shaw said, "Well, you know I am the boss", and he said words to this effect: "You do as I tell you to do and play ball with the administration or I will kick you out." I said, "All right." '

"Gravatt further stated that appellant Shaw on that same day gave him names of two or three candidates in some examination, that Shaw dictated the names to him and gave him a pad of paper and a pencil and Gravatt wrote them down. Three or four weeks later the two men had another conversation, no one else being present, with reference to which Gravatt testified as follows:

" 'I told Mr. Shaw that in connection with these few names that he had given me on the previous occasion that I had not been able to get them right at the top of the list and he asked why and I told him that their written grades were not sufficiently high and even if I gave them the maximum oral grade that could be given, there were still others who took the examination who were higher in the examination, and he said, "How is that?" And I said, "Well, they made higher marks on the written part of their examination." He said, "How did they make it?" I said, "I don't know; I guess they were just smarter." He said, "No, they couldn't be that smart. There couldn't be anybody make that high a grade on the square." He said, "Did anybody see the questions before the examination?" And I said, "Well, nobody but Mr. Cormack. He had asked to see them, one of the Commissioners." He said, "Well", he said, "I will talk to Mr. Cormack about that." '

"A few days later another conversation was had in appellant Shaw's office, with reference to which the witness Gravatt testified: 'Well, Mr. Shaw said that he had seen Mr. Cormack and talked to him and that Mr. Cormack was all right and I should do anything that he told me; that would be all right, and that if he gave me any names of any candidates taking examinations it would be all right to place

them as high as I could on the eligible list, but to check with him, Mr. Shaw, first.' Within a day or two thereafter, the witness Gravatt testified that the appellant Cormack gave him a list of names of candidates and told him to see that they got as high a rank as possible in the examinations that were being conducted; that Mr. Shaw was interested. Two or three weeks later, the witness called on appellant Shaw at his office and 'showed Mr. Shaw a rough report for an examination and pointed out the names of the candidates which he had previously given me and showed him where it was impossible to place them at the top of the list, due to the fact that others had such high grades, and he said: ''I don't understand that.'' He said, ''We had the questions and answers and we got a good oral mark and still you have got some strangers in here up higher on the list that should not be here.'' And he said, ''Are you sure there aren't any leaks in your office?'' I said, ''Well, I don't know of any. All the people, or most of the people have been there for some time, and I have had no reason to suspect that any of them would give out any information in advance of the examination and I use all the precautions we have to prevent leaks, and I don't know of any.'' He said, ''Well, then, there is only one thing to do and that is to take these people that are so high up that we can't get rid of them and don't know who they are and just simply cut their oral grade so low that they will be out of the picture.'' '

''The lists of names which the witness received from appellant Shaw were dictated to him in each instance, while the lists of names handed to him by appellant Cormack were written, both lists often containing the same names. When asked if he retained possession of such lists, the witness stated that he did not; that in some cases he threw them into the wastebasket and in others he turned them over to the clerk or examiner who had charge of the paper work in the examination. The witness also said he received lists of names from Mr. Charles Welch, assistant secretary to the mayor, beginning in the early part of 1937 under the following circumstances: 'Mr. Shaw had stated that it would be necessary for him to be away from the office a good deal of the time, and that whenever Mr. Welch asked me for any questions and answers in advance of an examination, I was to deliver those to Mr. Welch, and whenever Mr. Welch gave me lists

of names of any candidates participating in any examinations, that I was to take care of them in the same way that I had been for him.' The witness testified that with reference to any examination for position or promotion in the police or fire departments, he did not give a list of questions or answers in advance of the examination to any person other than appellants Shaw and Cormack and Charles Welch; that after receiving lists of names from these three men, he 'computed from the rough report about what oral grade would be necessary for them to have in order to bring them on the list in accordance with the lists which I had received and then instructed . . . two clerks, two examiners in the department to make those changes . . . on the rough report', to-wit: Mr. Arthur Dvorin, executive clerk and later research examiner, assigned to coordinate the work of the other examiners, and Mr. Bernard Kauffman, a general clerk in the examination division of the civil service department; that such changes were made on the rough sheet prior to the preparation of the smooth sheet, and he thereafter checked the rough report to see that his instructions were carried out.

"The witness Gravatt testified that all the persons named in the indictment had received grade adjustments on his orders which he gave to comply with the requests of appellants. With respect to the memorandum which he handed to Dvorin in connection with the examination for captain of the fire department (counts 17 to 22), Gravatt testified he told Dvorin that the mayor's office and the commission wanted the changes made.

"Over the objections of appellants that they were offenses not included within the charges of the indictment, Gravatt was permitted to testify concerning conversations he had with appellants in which they gave him lists of changes to be made in the grades for examinations other than police and fire department examinations, notably an examination which took place in 1935 for the position of sanitary and housing inspector. The witness testified he had a conversation with appellant Shaw on the subject of one Max Yedwalsky after the list for that particular examination had been certified, to the following effect: 'Mr. Shaw said, "There is a man by the name of Yedwalsky who took the examination for sanitary inspector and he didn't do so well. Is there anything we can do to give him a higher grade?" I said, "No, there

is not." He said, "Why not?" I said, "Because the report has been approved and the list has been fully established." And I said, "Furthermore, the book of civil service rules and regulations which provides for protests to be heard within one week after the list is tentatively approved and which provides for the adjusting of grades by the commission in case an injustice is found by the commission. That time has expired and I don't know of anything that can be done." Mr. Shaw said, "This is very important and we will find a way to do it." And I said, "All right." ' He also said he had a conversation on the same subject with appellant Cormack a day or two later, at which time 'Mr. Cormack said, "There is going to be a board meeting this morning and I want you to go in there and make a recommendation that Mr. Yedwalsky's grade be raised and I will make the motion." I said, "Well, I can't make any recommendation like that." Mr. Cormack said, "Why not?" I said, "Because the time has elapsed for hearing of protests on examinations and after that time has elaped there is no way on earth that the board can make any changes in marks or grades." Mr. Cormack said, "Well, there is a provision in the book of civil service rules and regulations whereby even after the protest period has expired a clerical error can be corrected at any time." I said, "Well, there isn't any clerical error." Mr. Cormack said, "Well, you can find one, can't you?" I said, "Well, I don't know how," and he said, "Now listen, this Mr. Yedwalsky is a very important man. He is a strong-arm man. He has worked for Al Lushing over in the water and power department, and he will do anything the administration wants. He will go out and commit robbery, burglary or even murder if necessary and we have got to do something for this man." I said, "All right, I will go in and make a recommendation." ' (A motion to strike, on the ground that the questions eliciting the above-quoted answer were asked by the deputy district attorney in bad faith and constituted misconduct, was denied.) The witness then testified that he appeared at the said meeting of the board and heard Commissioner Cormack tell the 'other members of the board that it had been discovered that in transposing the grades from one sheet to another that Max Yedwalsky had been marked lower than he should, and that

he made a motion to raise him a number of points, I forget the exact number.'

"S. May Smith, secretary to the city civil service commission, testified that she attended meetings of the commission taking minutes of all proceedings, and with reference to the meeting of August 7, 1935, she read from the minutes (Vol. 17, p. 6259) kept by her, that upon that date the general manager Gravatt submitted a report regarding the examination of Yedwalsky for sanitary and housing inspector, to the effect that a clerical error had been discovered by which Yedwalsky's oral grade of 87 had been transferred to the record as 77. The general manager asked the board to order the correction under the provisions of its rules and regulations and appellant Cormack moved such correction be made, whereupon the motion was seconded and adopted by the vote of all commissioners present.

"The cross-examination of Glenn G. Gravatt disclosed that there was then pending against him a misdemeanor charge for violation of section 118 of the city charter; that as general manager of the civil service department he had charge and control of all affairs of the department, and he regarded the individual commissioners as his superiors; that he did not make it a practice to submit questions and answers to the commission prior to the examination; that the rough reports constituted the data from which the smooth reports were made, and the smooth reports were the only reports that went to the commission for its action. An examination was not complete until the report had gone to the commission and had been acted upon; that in his experience the commission had frequently changed grades; that the record and certification department was under his management and control, and its card system was called the register which the city charter requires shall be kept. After the register of eligibles was made up the smooth report was filed in a vault in the civil service offices. Rough reports were kept on file as a custom rather than at his direction.

"Arthur Dvorin, who had been employed in the civil service department for thirteen years and ten months in the following capacities: messenger, junior clerk, general clerk, half code general clerk, executive clerk and research examiner, testified that his duties as executive clerk consisted of supervising the clerical staff in the examining division, the

scheduling of examinations, contacting various departments as to specifications and in drawing up requirements and duties for various examinations; that the duties of research examiner were primarily the same, except that he was very occasionally called upon to write and conduct an examination; that in general he directed the work of the examining division and assigned examinations to examiners under the direction of the general manager Gravatt''; that Gravatt mentioned to him the subject of changing of oral grades and that thereafter, pursuant to Gravatt's instructions, he had various of the examiners change the grades of applicants on their ''oral'' sheets, which altered grades were then transferred to the rough sheets and the general averages computed.

''It was brought out upon cross-examination that he first noticed changes being made in grades when he was executive clerk in 1934 or 1935; that such changes were made upon rough reports in the oral columns; that he received yellow sheets regarding such changes directly from Gravatt; that most of them were written in long hand and a few were typewritten; the fireman's list was received the second week of June, 1938, the engineer's list in 1936, the motorcycle list in 1937, and the auto fireman and captain's lists in 1938. He testified that he turned over all of these yellow lists to the district attorney, about one hundred twenty five in all; that he kept the lists in his office for a while and then took them home and surrendered them to the prosecution; that there were four hundred fifty or five hundred names on the yellow sheets which he received, names of candidates whose grades were to be changed according to Gravatt's instructions. He testified that this had been going on for four years; that Gravatt told him to make the changes on the rough reports; it was not part of the witness' duties to keep the yellow sheets in his office or at his home; that he kept them for personal reasons, i. e., because he thought there was something wrong about Gravatt's grade changing orders and he wanted to protect himself; that he explained to the board of civil service commissioners his failure to report Gravatt, because he thought if he did it would cost him his job; that Gravatt never did anything to lead him to believe he would fire Dvorin, if the latter remonstrated about the grade changing orders, nor did Gravatt say anything or threaten him in any

way. The witness identified People's Exhibit 26 as the slip pertaining to the fireman's entrance examination of January 8, 1938, and stated that when that slip was handed to him Gravatt did not say in effect that the mayor's office and the commission wanted the changes made. The witness stated that he never knew the mayor or Joe Shaw, and in his opinion the 'higher-ups' in his department were Gravatt and the commissioners; that in telling the board that neither he nor his clerks ever changed grades, he meant to say 'of our own volition'; that the only supervision he had over these changes was to hand the oral sheets to the clerks and tell them to make the changes; that his resignation became effective in February, 1938; that at the time he handed in his resignation, the then commission had started its investigation and had been under way a week or two.

"The witness Dvorin also testified that the only instructions he received were to have the examiners make the changes on their oral sheets; that these instructions he received from Gravatt, and there were no others; that he had a conversation with appellant Cormack in October, 1937, at the time Gravatt was away (on a European trip); that his talk with appellant Cormack concerned auto machinists' examination (which examination is not referred to in the indictment herein) and occurred in Gravatt's office with only himself and appellant Cormack present; that Cormack asked for a copy of the questions for said examination and the witness told him they had not been mimeographed; that Cormack then asked him where the rough copy was and the witness told him that Mrs. Tracy probably had it; that the witness then left the room and brought back the mimeographed copies for the test of auto machinist; that appellant Cormack looked at the stencil and removed the cushioned stencil sheet; whereupon Cormack returned the stencil to the witness but kept the cushion sheet which contained a copy of the questions for the said examination; that he complied with Cormack's request because he presumed Cormack had authority to make the same by virtue of the fact that he was a member of the board; that he assumed, since the commissioners composed the administrative body of the department, that they were in a sense superiors of the employees; that he considered appellant Cormack one of the higher-ups of the municipal government.

"With reference to the Dvorin-Cormack episode last referred to, Phyllis Tracy, executive secretary to the department, testified she recalled cutting stencils for the auto machinists' examination during Gravatt's vacation in 1937; that she saw Cormack in her office with Mr. Dvorin; that she did not hear any of the conversation between the two men; that she saw appellant Cormack and Dvorin go into Gravatt's office and in a few moments she saw Dvorin come out again, at which time he returned to her the stencils for the auto machinists' examination; that the cushion sheets from the stencils were missing; that on no occasion, except the one testified to, had any person ever requested her to turn over the stencils to be taken from her room; that she took precautions in locking the questions in her desk if she left the room and at night they were locked in a safe. On cross-examination she testified that all persons coming and going to Gravatts office passed through her room, including the examiners and other office help; that she occupied the room next to Gravatt's room since 1933, or four years prior to the incident just narrated; that there was a door from Gravatt's office leading directly into the hall, besides the one connecting with her room.

"Bernard Kauffman, general clerk of the department, testified that he worked under Dvorin; that after the written part of the examination for engineer in the fire department was held on October 30, 1936, he made erasures and substitutions of figures opposite names of certain candidates on rough sheets for that examination at the direction of Dvorin. He then recited in detail the various changes and erasures made in the grades shown on the rough sheets and in the final grades shown on the applications of various candidates, identifying People's Exhibits 2, 7, 9, 10, 12, 13, 14, 15, 27, 30, 32, 33, 36, 38, 39, 40; and stated he often made changes on rough sheets and applications other than those shown him during the instant trial; that all changes were made on orders from Dvorin and with Dvorin's knowledge and under his supervision; that no one else ever ordered him to make any changes; that appellant Shaw never talked to him about making changes; that he did not even know appellant Shaw; that neither did appellant Cormack talk to him about such a matter; that the witness made no objection to making the changes because he was only a clerk and had no alternative;

he thought the grade changing was unusual but did not discuss it with any one; that Gravatt ordered the examiners to make grade changes by sending in yellow sheets; that he received yellow slips from Mr. Gravatt in Mr. Dvorin's absence; and that it was his understanding from past experience and conversations with Dvorin that he was to take such slips to the examiners so they could change the grades.

"Charles S. Walbridge, employed in the civil service department in various capacities for eighteen years, testified that he was director of classification when Gravatt became general manager, and that he became an examiner either in July, 1933, or 1934; that he was one of the two examiners who conducted the practical tests in connection with the examination for engineer in the fire department on October 30, 1936; that the other examiner was Harvey W. Webber; that he and Webber graded without reference to each other and the two grades were added and the sum divided by two to arrive at an average grade, which was the official grade for that part of the examination; that Dvorin delivered to the witness and Webber a slip of paper (People's Exhibit 1) about the time when the official report of the examination was submitted to the board for tentative approval; that the witness drew a line on his oral sheet through the grades he had given the candidates named in the yellow slip and substituted therefor the grades shown on the slip, and then initialed the oral sheet to indicate that the adjustments had been made, making a memorandum of the changes in his own handwriting; that by reference to said memorandum (People's Exhibit 41) he was able to tell what the grades had been and to what they had been changed. The witness then recited various changes made in other examinations about which he was questioned, and testified he was instructed to make the changes by either Dvorin or Kauffman. Upon cross-examination, the witness stated that all the changes about which he testified were made under orders from Gravatt, in accordance with his authority as the witness's superior officer; that he made certain memoranda as to the changes as a matter of self-protection, because he assumed there was something wrong about Gravatt's orders; that he protested about the grade changes to Dvorin, Kauffman and to other examiners, but he never protested to Gravatt; that he made two records of the same transaction, did not file his memo-

randa, but took them home immediately and put them in a safe place.

"Mavis Moulton, a junior clerk in the department working under Dvorin, testified that she made changes in the rough report of auto fireman's examination, and changed the oral average and final grades upon certain named applications to conform to the changed grades on the rough report; that she first erased the original grade figures on the application before putting down the new figures in her own handwriting; that when she made' the changes on the rough report she had before her an oral sheet given to her by Dvorin; that she had no conversation with him at that time.

"Harvey W. Webber, who was continuously employed by the civil service department as an examiner for a period of thirteen years which ended on January 19, 1939, testified that during the time he was an examiner he was instructed to make changes in oral grades, the first of such instructions coming to him about January, 1934, from the general manager's office in a written memorandum through the research examiner's department. Referring to the examination of October 30, 1936, for engineer in the fire department, he testified that while conducting that examination he made grade entries on his rough report; that he was working with examiner Walbridge; that after the grading had been completed he received instructions to change the oral grades of certain candidates, such instructions being in the form of a written memorandum delivered to him by Dvorin; that the said witness made the changes as ordered, not because the qualifications of the candidates warranted such changes, but because he was ordered to do so.

"Another witness for the prosecution was Guy Kuykendall, who testified that he entered the employ of the city as an ordinary fireman on August 11, 1915, was appointed battalion chief in 1934 and retired November 11, 1938. During the 1933 campaign he met appellant Shaw at the campaign headquarters of Frank L. Shaw, who was then running for mayor; that he participated in both the 1933 and 1937 campaigns and during that time saw appellant Shaw a number of times; that two to four weeks before the examination for battalion chief was conducted in July, 1936, the witness had a conversation with appellant Shaw at the latter's office in the city hall, at which time said Kuykendall told 'Lieuten-

ant Shaw that that was an important position in the fire department, the position of battalion chief, and that those positions were men that carried quite a little influence, had men under their supervision and that those key positions should be filled with capable, competent men as well as men that were favorable to the administration . . . the Shaw administration . . . He (Shaw) said he realized it was an important position and he would find ways and means of helping the men out that I thought were competent and capable to fill those positions.' At a second conversation between the two men, fifteen or sixteen days before the examination for battalion chief took place, the witness testified he told 'Lieutenant Shaw that the examination was going to be held in a short time and I was willing to do anything to aid that man if I could do it right away, and he told me that within a day or two he would have the questions and answers for me for the coming examination . . . (he) asked me if I knew Herbert Dikeman and I told him that I did . . . that he was a good man and well qualified and would make a good officer in the department and he (Shaw) said he thought he was the right type of man for an officer in the department.' Two or three days later the witness met appellant Shaw at the Los Angeles Athletic Club, at which time appellant gave Kuykendall a list of questions and answers for the battalion chief's examination, consisting of between two hundred and two hundred fifty true and false questions. After receiving them, the witness asked appellant Shaw what he wanted him to do with the questions and answers after he was through with them and appellant told him to destroy them. He further testified that when he had coached the various applicants on the questions and answers he did destroy them; that thereafter he coached Captains Dikeman, Fien and Schroeder and during Mayor Shaw's campaign in 1937 he collected $100 from Dikeman, $250 from Fien and $50 from Schroeder, and he told appellant Shaw that 'those men felt very grateful for what had been done for them in the examination and that they had offered their willingness to work during the campaign or to help out in any way they could at any time they were called upon.'

"The foregoing testimony of Kuykendall has reference to the examination of battalion chief held in July, 1936, and is

not included among the examinations specified in the indictment herein.

"The witness Kuykendall testified with reference to the examination for engineer of the fire department conducted October 30, 1936, (covered by counts 1 to 16 of the indictment) that he again contacted appellant Shaw and received from him a list of questions and answers which he thereafter used to coach men personally selected by him, reciting the names of those men who were specifically referred to in counts 1 to 16 of the indictment and from whom he collected sums of money ranging from $10 to $100; and that, thereafter, between the time of the written examination and the time when the eligible list was made public, he gave appellant Shaw a list of the names of the men he had coached for this examination.

"With reference to the examination for captain of the fire department held in April, 1937, and referred to in counts 17 to 22 of the indictment, this witness testified he received questions and answers from appellant Shaw and coached certain candidates including Woodruff and Evans from whom he collected $300 and $85, respectively; that about the time he received the questions he gave them and a list of names to Captain Bentley, employed at engine house No. 27; that he later gave to appellant Shaw a list of the names of the various candidates that he and Captain Bentley had coached for this examination, and received from Bentley $1,600 to $1,800, of which he delivered to appellant Shaw approximately $1,500 in currency, and the rest he used in the campaign for the election of Mayor Frank Shaw.

"Some time before the examination for auto firemen conducted on July 29, 1937 (counts 23 to 38 of the indictment), Kuykendall had a conversation with appellant Shaw to the effect that if he was going to coach any men for that examination he must have the questions in advance, and appellant Shaw told him to see appellant Cormack about it; that between three and four weeks prior to that examination, he saw appellant Cormack at the latter's office at Ninth and Los Angeles Streets, at which time Cormack told the witness that he would see appellant Shaw and get his approval; that the witness subsequently did receive the questions but did not remember whether from Shaw or Cormack, but from either one of the two; that he thereafter coached several men and

also gave the questions and answers to Captain Bentley, together with three or four names, and collected from Bentley five or six hundred dollars, a portion of which was used during the campaign of 1937, and the remainder was turned over to appellant Shaw. The witness also testified that he gave to Cormack a list of the candidates that he and Captain Bentley had coached for this particular examination.

"With respect to the examination for fireman held about January 8, 1938 (counts 39 to 50 of the indictment), Kuykendall testified he talked to appellant Cormack about thirty days prior thereto and told him that he (Kuykendall) had several candidates he wanted to coach for that examination and he would need a list of questions in order to do that work in advance of the examination and appellant Cormack told him he would see appellant Shaw and let Kuykendall know later as to what he could do about it; that he thereafter received the questions and answers from appellant Cormack which he used in coaching candidates and also turned over a list of four or five names to Captain Bentley; that he made up a list of all candidates that he and Captain Bentley had coached and gave it to appellant Cormack. He collected seven or eight hundred dollars from Captain Bentley on this examination and received from Bentley a total of approximately $3,000 in connection with all these fire department examinations; that 'some of that money was turned over during the 1937 campaign, some of it was turned over in 1938 to Lieutenant Shaw, some of it was used in the campaign of 1937 and some was used in the campaign of 1938, . . . the recall election.' This witness further testified that the aggregate amount of money that he collected personally and received from Bentley for coaching candidates for the various oral examinations for the fire department amounted to $7,000 or $7,500; that he organized a political club (the F. L. S. Club) and received from the members some $1,000 or $1,200, some of which was used for the expenses of the club and the remainder turned over to appellant Shaw for campaign purposes. He testified that this club was active in both the 1937 and 1938 campaigns; that he made suggestions to appellant Shaw with reference to changes and transfers of men in the fire department on the theory that it would help to build up the Shaw administration by putting certain

men in important positions; that he knew Glenn G. Gravatt only by sight and never had a conversation with him.

"The testimony of this witness disclosed that the persons coached by him and Bentley and whose names were contained in the lists which he later presented to appellants were the same persons in the main whom Glenn G. Gravatt claimed he was asked to favor by falsely altering their oral interview grades, and by such process move such candidates forward in rank.

"The main contention of appellants is that there was not sufficient corroboration of the testimony of their [asserted] accomplices to satisfy the requirements of section 1111 of the Penal Code:

" 'A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.'

"Quoting from 8 California Jurisprudence 173: 'The word "accomplice" has been defined as including all persons who have been concerned in the commission of an offense. (*People* v. *Kraker,* 72 Cal. 459 [14 Pac. 196, 1 Am. St. Rep. 65]; *People* v. *Ruef,* 14 Cal. App. 576 [114 Pac. 48, 54]; see, also, *People* v. *Bunkers,* 2 Cal. App. 197 [84 Pac. 364, 370]; *People* v. *Kinsley,* 118 Cal. App. 593 [5 Pac. (2d) 938]; *People* v. *Frahm,* 107 Cal. App. 253 [290 Pac. 678].) In other words, one is an accomplice who knowingly, voluntarily and with common intent with the principal offender unites in the commission of the crime. (*People* v. *Bolanger,* 71 Cal. 17 [11 Pac. 799]; *People* v. *Davis,* 210 Cal. 540 [293 Pac. 32]; *People* v. *Linde,* 131 Cal. App. 12 [20 Pac. (2d) 704]; see, also, *People* v. *Howell,* 69 Cal. App. 239 [230 Pac. 991].) In several cases, the courts derived a definition from the language of section 31 of the Penal Code, holding that accomplices are all persons concerned in the commission of a crime, whether they directly commit the act constituting the offense, or aid and abet in its commission, or not being present, have advised and en-

couraged its commission. (*People* v. *Coffey*, 161 Cal. 433 [119 Pac. 901, 39 L. R. A. (N. S.) 704]; *People* v. *Collum*, 122 Cal. 186 [54 Pac. 589]; *People* v. *Lawlor*, 21 Cal. App. 63 [131 Pac. 63]; see, also, *People* v. *Moran*, 144 Cal. 48 [77 Pac. 777].)'

"In *People* v. *Stanley*, 92 Cal. App. 778, 783 [269 Pac. 465], it was held that 'except in those instances where the rule is altered by special statute, an accomplice is one who has been concerned in the commission of a crime, whether he has directly committed the act or aided and abetted in its commission or advised and encouraged its commission and is liable to prosecution for the identical offense charged against the defendant. As thus construed, it does no violence to our sense of justice by saying that an innocent man may as a matter of law be the accomplice of a debased felon and is entirely consistent with those authorities which hold that persons are not accomplices, who, although present for one reason or another, are not guilty of criminal participation.'

"A review of the testimony hereinbefore narrated in detail clearly indicates that the named employees of the civil service department under the orders of their superior officer, Gravatt, directly committed the acts which they admitted they knew were wrongful and which the appellants were charged with aiding and abetting. This [might well] constitute them accomplices under the law. Moreover, the very precise wording of each count of the indictment itself, that appellants did 'aid and abet, advise and encourage, and by threats . . . and coercion compel' said Gravatt and other employees of his department to violate the provisions of section 113 of the Penal Code, definitely [tended to] place both Gravatt and the other employees of the civil service department in the category of accomplices, rendering them liable to be prosecuted for the same offenses with which appellants were charged."

But, even if the employees of the civil service department who participated in the grade changes, other than Gravatt, were not in fact accomplices, their testimony, as disclosed by the foregoing *résumé*, in no way tends to connect either of the appellants with the crime charged, viz., alteration of public records. Other than Gravatt, the admitted accomplice, not one of them indicated any connection between the appellants and his activities in changing the records. Under the

authorities to be later referred to, their testimony fails to corroborate in any particular the testimony of the accomplice Gravatt, for it takes direction and tends to connect the appellants with the offenses charged only when interpreted by and when read in conjunction with the testimony of the admitted accomplice Gravatt. As shall later be shown, this is not sufficient corroboration under the authorities.

''This [latter] is likewise true [of the testimony] of the retired battalion chief Kuykendall. Positions for employment in the fire department were all within the classified civil service of the city of Los Angeles, and according to the testimony of said Kuykendall, he and appellant Shaw entered into an agreement to place in those positions men friendly to the Shaw administration. To accomplish this purpose, appellant Shaw secured from Gravatt copies of questions and answers for forthcoming examinations which he gave to Kuykendall, who in turn used them in coaching such candidates as he might select. Thereafter, Kuykendall supplied appellants with recommended lists of names, which appellant Shaw passed on to Gravatt for further action. The alteration and falsification of the grades of candidates as alleged in the first fifty counts of the indictment was [assertedly] done to insure the ultimate appointment of those candidates who were selected and recommended by Kuykendall as persons disposed to be friendly to the Shaw administration.''

But, as indicated above, Kuykendall's testimony (whether or not he be regarded as an accomplice, a point we need not decide), like that of the others, in no way tends to establish the crime of alteration of public records or to connect the appellants therewith, except possibly when read in conjunction with and interpreted by the testimony of the accomplice Gravatt. As stated above, however, this is insufficient corroboration under the authorities.

''In answer to appellants' contention with respect to the lack of evidence corroborating the testimony of the accomplices, respondent urges that 'by not only eliminating the testimony of the admitted accomplice Gravatt, but also omitting the testimony of Kuykendall and the employees of the civil service department of the city of Los Angeles . . . there is substantial evidence to connect appellant Shaw with the conspiracy to build up a political machine in the city of Los

Angeles and to use whatever means necessary, either criminal or otherwise, to accomplish this purpose.' ''

Appellants are not here charged with or convicted of building up a ''political machine'', or with improperly collecting campaign funds, assuming either to be a crime.

''Appellants were charged with violations of section 113 of the Penal Code, in that they aided and abetted, advised and encouraged, and by threats and coercion compelled Glenn G. Gravatt and other employees of the civil service department to alter and falsify public records, consequently the corroborating evidence must of itself and without the aid of the testimony of the accomplices connect or tend to connect appellants with the commission of the offenses charged against them.

''In the case of *People* v. *Braun,* 31 Cal. App. (2d) 593 [88 Pac. (2d) 728], the question presented was similar to the question here, as to whether or not there was corroboration of the testimony of an accomplice to the effect that defendant had advised and encouraged him to commit the crime of robbery in the perpetration of which a murder resulted. The opinion of the Court in the Braun case stated that the corroborating evidence must tend directly and immediately to connect the defendant with the commission of the offense and that, regardless of how strong the corroborating evidence might be in other respects, it must point to the connection of the defendant with the commission of the crime charged to be of any avail, and that corroborative evidence is insufficient where it only casts a grave suspicion upon the accused.

''We quote from the opinion in the Braun case at page 599: 'There is no direct evidence connecting appellant with the crimes charged in the information, for the reason that he did not actually participate in the robbery or the shooting in connection therewith. He could be convicted, therefore, only on the ground that though inactive during the commission of the offenses, he had previously advised and encouraged the hold-up in the perpetration of which one man was killed and another wounded. The only direct evidence that appellant knew of the contemplated robbery or that he had previously advised and encouraged it is supplied by the witness Roble, and he concededly being an accomplice, his testimony must be corroborated. ''A conviction cannot be

had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. . . . '' (Pen. Code, sec. 1111.)

'' 'It will thus be seen that the statute imperatively makes corroboration of the testimony of the accomplice an essential prerequisite to the conviction of the defendant, where the crime charged rests primarily and solely upon the testimony of an accomplice; and it is apparent, therefore, that the court has no control over the subject except to apply the statute. In *People* v. *Morton,* 139 Cal. 719, 724 [73 Pac. 609] . . . [this] Court quoted with approval the following language found in *Welden* v. *State,* 10 Tex. App. 400: '' . . . eliminate from the case the evidence of the accomplice, and then examine the evidence of the other witness or witnesses with the view to ascertain if there be any inculpatory evidence— evidence tending to connect the defendant with the offense. If there is, the accomplice is corroborated; if there is no *inculpatory* evidence, there is no corroboration, although the accomplice may be corroborated in' regard to any number of facts sworn to by him.'' In the same case of *People* v. *Morton, supra,* [this] Court voiced its approval of the rule as stated in *Simms* v. *State,* 8 Tex. App. 230: ''The evidence must tend directly and immediately to connect the defendant with the commission of the offense.''

'' 'In New York, under a code provision similar to our own (Code Crim. Proc., sec. 399), it was said in *People* v. *Ryland,* 28 Hun, 568. 570, ''The corroboration, however strong in all other respects, must point to the connection of the defendant with the commission of the crime to be of any avail.''

'' 'That more is required by way of corroboration than mere suspicion is firmly established in the law of this state. (*People* v. *Kempley,* 205 Cal. 441, 456 [271 Pac. 478], and cases therein cited; *People* v. *Davis,* 210 Cal. 540 [293 Pac. 32].) In *People* v. *McLean,* 84 Cal. 480 [24 Pac. 32], we find the following:

'' ' ''But although more is required by way of corroboration than to raise a mere suspicion (see *People* v. *Thompson,* 50 Cal. 480) yet the corroborating evidence is sufficient if it, of itself, tends to connect the defendant with the commission of

the offense, although it is slight, and entitled, when standing by itself, to but little consideration." '

" 'The query of how much is required in order to constitute corroboration has been answered by many cases wherein it is decided that "corroborative evidence is insufficient when it merely casts a grave suspicion upon the accused." (*People* v. *Robbins,* 171 Cal. 466 [154 Pac. 317] ; *People* v. *Woodcock,* 52 Cal. App. 412, 417 [199 Pac. 565] ; *People* v. *Janssen,* 74 Cal. App. 402, 407 [240 Pac. 799].) In *People* v. *Allison,* 200 Cal. 404 [253 Pac. 318] the court is given no alternative but to set aside the conviction unless the testimony of the accomplice is corroborated in accordance with section 1111 of the Penal Code, as that statute has been interpreted by the courts. (See, also, *People* v. *Robbins, supra,* at p. 469.) '

"Again in *People* v. *White,* 35 Cal. App. (2d) 61 at 69 [94 Pac. (2d) 617], it was stated in regard to the subject of corroboration: 'There is, of course, no dispute respecting the provision of section 1111 of the Penal Code that the testimony of the accomplices must be corroborated and in the absence of any such corroboration a conviction may not stand. The difficulty comes in determining what corroboration is sufficient. First, we must eliminate from the case the evidence of the accomplice, and then examine the evidence of the remaining witness or witnesses with the view to ascertain if there be inculpatory evidence,—evidence tending to connect the defendant with the offense. If there is, the accomplice is corroborated, if there is no *inculpatory* evidence, there is no corroboration, though the accomplice may be corroborated in regard to any number of facts sworn to by him. (*People* v. *Kazatsky,* 18 Cal. App. (2d) 105, 110 [63 Pac. (2d) 299] ; *People* v. *Morton,* 139 Cal. 719 [73 Pac. 609] ; *People* v. *Davis,* 210 Cal. 540 [293 Pac. 32] ; *People* v. *Kempley,* 205 Cal. 441 [271 Pac. 478].) '

"In *People* v. *Hobson,* 7 Cal. App. (2d) 392, 394 [46 Pac. (2d) 278], it is stated: 'The question of the corroboration of an accomplice was discussed at length and the authorities reviewed in the case of *People* v. *Kempley,* 205 Cal. 441, 456 [271 Pac. 478], where it is said: "The question of how much more than a mere suspicion is required in order to constitute corroboration has been answered by many cases in declaring further that 'corroborative evidence is insufficient when it merely casts a grave suspicion upon the accused.' (*People*

v. *Robbins,* 171 Cal. 466, 470 [154 Pac. 317] ; *People* v. *Woodcock,* 52 Cal. App. 412, 417 [199 Pac. 565] ; *People* v. *Janssen,* 74 Cal. App. 402, 407 [240 Pac. 799].) The code section is mandatory (*People* v. *Allison,* 200 Cal. 404 [253 Pac. 318]), and a conviction cannot stand unless the testimony of the accomplice is corroborated in accordance with the standards laid down by the courts in the interpretation of the statute. 'The court has no discretion in the matter, but is bound to apply the statute indiscriminately to all cases whenever an accomplice appears as a witness, and the State's case depends solely upon his uncorroborated testimony.' (*People* v. *Robbins,* 171 Cal. 466, 469 [154 Pac. 317, 318].) If the testimony of the accomplice is not sufficiently corroborated, the conviction of the accused is wholly wanting in a legal foundation to support it. (*People* v. *Viets,* 79 Cal. App. 576, 587 [250 Pac. 588].)''''''

In *People* v. *Davis,* 210 Cal. 540 [293 Pac. 32], it is declared: "Taking the testimony of the several witnesses offered in corroboration of the story told by Ben Getzoff, it is exceedingly doubtful whether any of it, or all of it together, in and of itself amounts to corroborative evidence tending to connect the defendant with the commission of the crime charged. In order to give it effect even as tending in that direction, it seems at every point necessary to interpret and explain this 'corroboration' in the light of the testimony of Ben Getzoff. It requires the testimony of Ben Getzoff to give it direction to the alleged crime, before it can be said to connect the defendant with the commission of the crime. But the law requires that such testimony offered in corroboration of the testimony of an accomplice shall *of itself* tend to connect the defendant with the offense charged."

"For the purpose of applying these rules of law, a summary of the [other] evidence, which respondent urges is corroborative of the testimony of the accomplices, follows:

"Officer Morris testified he had a conversation with appellant Shaw and Peter Del Gado in March of 1937, when they discussed certain charges which had been brought against him (Morris) by the chief of police and upon which he had a hearing in January, 1937, when he was exonerated and restored to duty; he said appellant Shaw wanted to know if he had received his back pay for the time he was suspended—from December 16, 1936, to some time in January, 1937, and

Del Gado asked what he had done with it, to which the witness replied he had used it to pay his honest bills and support his family; that Del Gado then said there was a preferred list of officers who contributed to the campaign and were friendly to the administration, to which appellant Shaw agreed, saying that all friends of the administration would be taken care of. Del Gado then asked the witness if he intended taking the examination for sergeant scheduled for April of 1937, to which the witness replied that he did, whereupon Del Gado said, 'Well, I just wanted to know if you were going to take the examination because there might be some way that I could help you.' Del Gado also told said witness that the reason he had been acquitted of the charges preferred against him was because appellant Shaw 'had fixed it', to which Morris replied that every thing had been above board and that no fixing had been necessary. He also testified that neither Del Gado nor Appellant Shaw suggested that he give them any money.''

Applying the rule as set down by the authorities, *supra*, this testimony in no way tends to connect the appellants with any crime involved in the changing of grade records. It is equally consistent with any other type of assistance (legal or otherwise) to the so-called ''preferred list.'' Without the interpretation and direction furnished by the testimony of the accomplice Gravatt, this testimony is meaningless and in no way tends to connect the appellants with the offenses of which they stand convicted.

''Roy Groom, transportation manager for a local bread company, testified that about May of 1937 he received a list of numbers and a list of names of police officers from Peter Del Gado and was told which numbers represented true or false answers; that he gave this list of numbers to various police officers and received campaign contributions from some of them, which he turned over to Peter Del Gado. The witness also testified that he was present at a banquet at Rene & Jean's Cafe when appellant Shaw thanked the various motorcycle officers there present for their contributions and told them that the money was not needed and would be returned to them by a friend they all knew and trusted, Roy Groom; that thereafter an envelope containing money and a list of names was handed to him, but not by appellant Shaw. Upon examination he discovered that the list of names was larger

than the list of names he had previously given Del Gado; that he returned the money to the officers named in the list. This witness also testified that he had known appellant Cormack to speak to for a couple of years and had a telephone conversation with him prior to October or November, 1938, at which time Cormack told him he understood the motorcycle officers had put him (the witness) and Del Gado 'in the middle', to which said Groom replied, 'What do you mean by that?' Appellant Cormack is alleged to have answered, 'Well, I understand they involved you in a payoff', to which Groom replied, 'I don't understand what you are talking about. You know better than to involve me in such a situation.' "

What we have interpolated above with respect to the testimony of the witness Morris is equally applicable to Groom's testimony. It falls far short of furnishing the corroboration of Gravatt's testimony required by the authorities.

"Walter E. Weyerman, acting captain of the police, stationed in Highland Park, testified he had been with the department for twenty two years, knew appellant Shaw and had kept a luncheon engagement with him at the Los Angeles Athletic Club in September, 1936, at which time they discussed his job with the department and Shaw asked him how long he had been acting captain and how he would like to be captain; also if he had passed any of the examinations. Weyerman replied he had passed all but one but had received no appointments; Shaw then asked him if he favored the administration and he replied that he did not, whereupon Shaw asked him how he would like to be fourth on the list and Weyerman wanted to know what was the matter with being first, also that he wanted nothing more than a break and that he had never asked for favors in his long years of service with the department. He further testified that he never became a captain and at the time appellant Shaw talked to him he had just been reduced to a lieutenant and had been sent to Highland Park."

We here repeat what we said above with respect to the testimony of Morris and Groom, adding that any implied offer of appellant Shaw to be of assistance in placing the witness "fourth on the list" might equally be fulfilled by furnishing in advance the questions and answers of an examination, or any other method of assistance (whether legal

or not), and as to which the appellants are neither charged nor convicted.

"Herbert E. Dikeman, who had been employed in the fire department for a period of twenty four years, testified that in 1934 he met appellant Shaw in San Pedro while the witness was captain of fireboat No. 2, and discovered that he had been on the United States battleship Vermont with appellant Shaw between 1910 and 1914; that appellant Shaw invited him to call on him at the city hall; that in June, 1936, the witness presented himself at Shaw's office to discuss the forthcoming examination for battalion chief, at which time he told Shaw he had taken two examinations and was number nine on the list for the 1934 examination, but had been moved back four places on the final list; that he wanted to know if there was anything Shaw could do to keep him from being moved back on the forthcoming examination, to which Shaw replied that he was not civil service, and then asked if the witness had studied for the job; the witness replied that he had spent six years studying and felt qualified for the position, and Shaw said he appeared to be a man who would return a favor. Subsequently, the witness called upon Guy Kuykendall at his home in response to a telephone call, and thereafter Kuykendall coached said Dikeman in preparation for the examination of battalion chief. In October, 1936, after the examination had been held, the witness met appellant Shaw at a dinner attended by other firemen, and thanked Shaw for what he might have done for him in this examination. Subsequently, he paid Kuykendall $100 as a contribution to the Shaw campaign fund; that at the time he attended the dinner the eligible list had been published giving the witness number two place thereon; that he received his appointment in July of the following year."

This testimony, like that of the other witnesses just discussed, requires the interpretation and direction furnished by the accomplice Gravatt's testimony to give it value. Under the settled rule, it is not corroborative. Moreover, as indicated in connection with Weyerman's testimony, any implied offer of assistance by appellants may equally have been fulfilled in any number of ways other than grade record changes, the offense here charged.

"According to the witness Morris, his brother officer Del Gado, who later fled the jurisdiction of the courts while at

large on bail which was forfeited by his bondsmen, seemed interested in the fact that said Morris expected to take a promotional examination and stated to him that there might be some way in which he (Del Gado) could help him. How this was to be accomplished was left unexplained, and while appellant Shaw was present at this conversation, nothing was either said or done by him which could be construed as inculpatory on his part. In order to give this evidence effect as tending to connect appellant Shaw with the offenses charged against him, it is necessary to interpret and explain it in the light of the testimony of the accomplice Gravatt. Eliminating the testimony of the accomplice, this evidence standing alone is insufficient to raise even a suspicion of guilt upon the part of either appellant. . . .

"Moreover, neither the police sergeant's examination referred to by officer Morris, the examination for police captain referred to by officer Weyerman, nor the examination for battalion chief referred to by the witness Dikeman, forms the basis of any of the transactions charged as offenses in the indictment."

It is questionable, therefore, whether "the evidence furnished by these three witnesses, under the authority of the Braun case and the other cases cited, *supra*," furnished anything "in the way of corroborating the testimony of the accomplice Gravatt to the effect that appellants aided and abetted, advised and encouraged, and by threats and coercion compelled him to alter the grades of some thirty-three candidates as charged in the sixty-six counts of the indictment, in connection with the five civil service examinations therein specifically referred to. In other words, it is not the type of evidence which tends directly and immediately to connect appellants with the offenses charged against them.

"The testimony of the witness Groom with respect to his transaction with Peter Del Gado which was permitted to be introduced over the objection of appellants was purely hearsay and therefore incompetent, and the fact that the prosecution attempted to connect it up by showing that appellant Shaw made a speech at a dinner attended by a group of motorcycle officers at which time he [assertedly] returned to them through the witness Groom certain contributions which they had previously made to the Shaw campaign, did not cure

the error of its admission. Further, the purported conversation between this witness and appellant Cormack only shows to what lengths the prosecution went in its vain attempt to" procure corroboration. In addition, neither of said portions of the witness' testimony tended to connect the appellants with the offenses charged.

█ ''The testimony introduced with reference to the Yedwalsky matter was incompetent because it was an attempt to establish the commission by appellant Cormack of an offense completely outside the issues herein, it having reference to the examination of sanitary and housing inspector, which had not the slightest connection with the five examinations upon which the indictment herein was founded. The testimony of these witnesses, as well as of the various police officers who testified they received coaching for civil service examinations in return for campaign contributions has no evidentiary force concerning the offenses charged, except to create an atmosphere of suspicion. █ Corroborating testimony which merely raises a suspicion of a defendant's guilt is not sufficient. (*People* v. *Davis,* 210 Cal. 540, 559 [293 Pac. 32].)''

It must, as already indicated, tend to connect the appellants with the commission of the offenses charged and of which they stand convicted.

Before proceeding to other matters, the determination of which may be of assistance in the event of a re-trial of this cause, it is not inappropriate to point out that each of the appellants took the stand in his own defense and categorically denied the accusations and charges made against him in the testimony of the accomplice Gravatt. They also denied any knowledge of or participation in any illegal alterations of the records. Contrary to respondent's intimation, we find nothing in the testimony of the appellants nor in their demeanor as witnesses, as reflected by the record, which in any way tends to furnish the corroboration of Gravatt required by law. By other witnesses the appellants also attempted to show that it had been the long established but secret practice of Gravatt to sell for his own enrichment questions and answers to approaching civil service examinations, the theory underlying this showing apparently being that Gravatt attempted to shift responsibility when his asserted improper practices were brought to light or were about to be uncovered.

Because of the possibility of a re-trial, we express no opinion upon the sufficiency or effect of such showing.

■ In conclusion, and for the guidance of the trial court in the event of a re-trial, it is well to state that we find no merit in the appellants' further contention that, even if all the evidence be accepted as true, it serves only to make out a case of misdemeanor under section 118 of the charter, and not one of felony under section 113 of the Penal Code, under which they were charged and convicted. Without quoting the two sections, we are satisfied that so far as material here the Penal Code section defines and denounces as a felony any willful *alteration* of a record in the custody of a public officer or deposited in a public office. The charter provision, on the other hand, is addressed more particularly to obstructions of the municipal civil service in the prevention of candidates receiving a fair examination and the falsification of the original record—not with the *alteration* of the record as originally made. We find nothing in the charter provision that will preclude such a charge as is here made under the Penal Code section.

■ Nor do we find any merit in the appellants' contention that the application blanks and "rough sheets" upon which the alleged alterations were made were not "records" within the meaning of the Penal Code section. As stated in *People* v. *Tomalty*, 14 Cal. App. 224 [111 Pac. 513], and the authorities there cited, "In order that an entry or record of the official acts of a public officer shall be a public record, it is not necessary that such record be expressly required by law to be kept, but it is sufficient if it be necessary or convenient to the discharge of his official duty. 'Any record required by law to be kept by an officer, or which he keeps as necessary or convenient to the discharge of his official duty, is a public record.' . . . " The evidence here discloses that the applications and "rough sheets" assertedly altered were part of the permanent records of the Civil Service Department, kept for the proper operation and convenience of the department and consequently were "records" within the meaning of section 113 of the Penal Code.

In view of our conclusion that the conviction of appellants must fall because of the absence of corroborating evidence, the judgments founded thereon cannot be sustained.

The appeal from the order denying the objections of each appellant to the pronouncement and imposition of judgment and sentence is dismissed. The judgments and the orders denying appellants' motions for new trial are, and each of them is, reversed.